

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3957 | **DATE** | September 27, 2001 |
| **CASE TITLE** | Samuel Rocket v. Marten Transport, Ltd. et. al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum Opinion and Order, this Court GRANTS defendant Marten Transport's motion for summary judgment [59-1], GRANTS defendant Jacqie Teigen's motion for summary judgment [61-1], and GRANTS Plaintiff Samuel Rocket's motion for leave to modify his LR 56.1 response [130-1]. Any other pending motions are moot and terminated. This action is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 28 2001 | |
| | Notified counsel by telephone. | | date docketed | 136 |
| X | Docketing to mail notices. | | | |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| mds(lc) | courtroom deputy's initials | 01 SEP 27 PM 5: 43 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SAMUEL ROCKET, | ) |
| Plaintiff, | ) |
| | ) No. 99 C 3957 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| MARTEN TRANSPORT LTD, and | ) |
| JACQIE TEIGEN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Samuel Rocket ("Rocket") brings a discrimination action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. §§1981 ("§1981"), alleging that his former employer, Marten Transport Ltd. ("Marten") and his fleet manager, Jacqie Teigen ("Teigen") discriminated against him on the basis of race in firing him. Before this Court are defendant Marten's and defendant Teigen's motions for summary judgment on both counts, motion to strike plaintiff's Local Rule 56.1 Response to Defendants' Statement of Undisputed Material Facts, and motion to strike affidavit of Attorney Moenning. Simultaneously before this Court are plaintiff's motion for partial summary judgment, motion to strike defendants' Local Rule 56.1 Response to Plaintiff's Statement of Undisputed Material Facts in Support of Partial Summary Judgment, motion for leave to modify plaintiff's Local Rule 56.1 response, and motion to strike affidavit of Susan Baier. For the reasons stated below, this Court GRANTS defendants' motions for summary

judgment on both counts, DENIES as moot defendants' motions to strike plaintiff's Local Rule 56.1 Response and to strike affidavit of Attorney Moenning, DENIES plaintiff's motion for partial summary judgment, DENIES as moot plaintiff's motion to strike defendants' Local Rule 56.1 Response, GRANTS motion for leave to modify plaintiff's Local Rule 56.1 response, and DENIES plaintiff's motion to strike affidavit of Susan Baier.[1]

## I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Cox v. Acme Health Serv., Inc., 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

---

[1]This case has a long history and was originally before Judge Plunkett. This Court received this case pursuant to 28 U.S.C. §294(b). As Defendants point out, Plaintiff's motion to strike affidavit of Susan Baier is exactly the same as a motion Plaintiff filed previously and which Judge Plunkett denied on March 7, 2001. Defendants also object to Plaintiff's motion for leave to file a Modified Response, arguing very persuasively that not only does Plaintiff rely on no new law or circumstance that justify Plaintiff's failure to respond properly the first time, but also that Judge Plunkett strictly instructed Plaintiff's counsel to file his entire response to Defendant's motion for Summary Judgment by the end of the day on March 23, 2001. This Court, however, exercised its discretion and considered Plaintiff's Modified Response because even with the Modified Response, Plaintiff does not survive summary judgment.

The movant bears the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552-53. The non-movant cannot rest on the pleadings alone, but must designate *specific facts* in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992). The non-movant "'must do more than simply show that there is some metaphysical doubt as to the material fact.'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S. Ct. at 2511. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Anderson, 477 U.S. at 255, 106 S. Ct. at 2515.

## II. Background

This case arises from events surrounding Rocket's termination from his position as a dedicated truck driver with Marten.[2] Marten hired Rocket, an African American male, on an at-will employment basis beginning on May 26, 1997. Rocket's assignment was as a truck driver on a dedicated route for Anheuser-Busch out of Arlington Heights, Illinois, which he worked from May 26, 1997 up until his termination on July 24, 1998. As a dedicated driver, Rocket was responsible for hauling loads on a regular basis from Anheuser-Busch's Arlington Heights Warehouse Service Center to wholesaler customers of Anheuser-Busch in Illinois and Wisconsin.

Teigen was Rocket's fleet manager and dispatcher over the course of Rocket's entire employment, and Terry Grochowski ("Grochowski") joined Teigen as an additional fleet manager and dispatcher in April 1998.[3] As fleet manager dispatchers, Teigen and Grochowski

---

[2]Unless otherwise indicated by a showing of disagreement, the facts listed below are either undisputed or deemed admitted by Plaintiff because Plaintiff's Modified Response in Plaintiff's Local Rule 56.1(b)(3)(A) motion either 1) inappropriately denied the material fact by citing to an exhibit that agreed with the Defendants' statement of material facts, or 2) was unsupported by proper citation that specifically referred to the record, affidavits, or other supporting materials relied upon for disagreement, as required by Local Rule 56.1(b)(3)(A) and (B), which this Court strictly enforces. Plaintiff's and Defendants' motions to strike Local Rule 56.1 responses are denied as moot because statements and responses that are not supported by the record, or that are supported with citations to entire affidavits are disregarded. See Johnson v. Indopco, Inc., 887 F.Supp. 1092, 1095 (N.D. Ill. 1995). "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes . . . ." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 922 (7th Cir. 1994). Additionally, since replies to Local Rule 56.1(b)(3)(A) responses are not permitted under Local Rule 56.1(a), this Court disregards Defendants' Reply to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts.

[3]Defendants assert that Grochowski shared duties with Teigen as fleet manager beginning in May 1997. The exact date that Grochowski actually began working as fleet manager, however, is not relevant to the outcome of this case.

were responsible for scheduling, assigning, and dispatching the Anheuser-Busch loads to the various trucks and drivers on that route. They also handled any problems that arose in the course of the product delivery, such as truck breakdowns, missing product, malfunctioning refrigeration units on trucks, customer complaints regarding late pickup or delivery, etc.. They also documented any incidents or issues the drivers had, discussed problems with the drivers, and filed "Conduct Reports" in the drivers' personnel files. Teigen or Grochowski were not required to notify Rick Searing ("Searing"), Director of Human Relations, or anyone else in Human Relations that they were placing conduct reports in a driver's file.

Rocket had very little direct, personal communication with Teigen. During his thirteen months of employment, Rocket only met Teigen on two occasions and spoke with her rarely. At Rocket's first meeting with Teigen, he states she expressed a "nonchalant attitude." The second time he met Teigen, Rocket had very little conversation with her. Rocket estimated spending approximately 30-35 minutes total time with Teigen during his entire employment, and he admits that he only actually spoke with Teigen on a "very rare occasion." At one point during Rocket's employment, Teigen had a telephone conversation with Dan Webster, a white dedicated driver on the Anheuser-Busch route, about Rocket being late. Dan Webster claims that Teigen ended the conversation referring to "Them type of people" and "I'm not even going to go there." Teigen denies making these statements.

As Teigen had very little direct communication with Rocket and the other dedicated drivers, the primary means of communication between the fleet managers and the drivers was through the Qualcomm satellite communication system. Qualcomm sends data to and from the truck via a keyboard and a computer screen. It is through Qualcomm that drivers would inform

-5-

the fleet managers about any problems and through this system, the drivers would receive assignments to haul extra loads. Extra loads are loads that were not in a driver's original schedule but were added either at the request of Anheuser-Busch or because for some reason those loads had not been delivered as scheduled. Because the dedicated drivers were paid a salary, they did not receive additional compensation for hauling these extra loads.

Marten claims Rocket was not meeting it's legitimate performance expectations. Rocket's personnel file contains several conduct reports. In particular, there are five conduct reports and one letter that actually constituted misconduct, or "warnings." Teigen authored at least three of these conduct reports, as well as other conduct reports that Marten admits did not constitute misconduct. Rocket claims that he was unaware of any conduct reports in his file until his deposition. For the conduct reports that constituted misconduct, however, Marten did speak with Rocket about each incident as it occurred. Unless otherwise noted below, Rocket agrees that he spoke with Marten about each incident.

A conduct report dated August 29, 1997 and signed by Teigen states that Rocket was reported late for pickup at Anheuser-Busch two different times.[4] Rocket participated in a telephone conference call with Marten regarding late pickup times and he agreed to pay more attention to on time pickups.

---

[4]The conduct report states that Brian Kielbasa, who was the Warehouse Manager for Anheuser-Busch at Arlington Heights, reported Rocket. While Mr. Kielbasa does not recall the particular complaint referred to in the conduct report–in fact he cannot recall the names of any driver about which he complained–he stated that it was possible Rocket had late deliveries. Further, Rocket admits having this conversation with Teigen in August 1997 in which she told him that Mr. Kielbasa was not happy with his pick up and deliveries.

-6-

A conduct report dated September 2, 1997 indicates that Rocket was placed on a three-month probation period and that his job performance would be monitored closely. This report documents an incident in which Rocket's son was taken to the hospital and Rocket went to see him. Marten received the call from the hospital and instructed Rocket to drop his loaded trailer at Anheuser-Busch in Arlington Heights and call Marten back after he had seen his son. According to the report, Rocket was written up because he said that he would update his fleet manager at 11:00 a.m., but did not call in until 1:30 p.m.; he did not leave the proper paperwork with his load, and he did not leave the refrigeration unit in the truck running. Specifically, the report states that Rocket "needs to work on his communication skills." Rocket states he does not recall whether he told Marten he would call back at the specified time, nor does he recall being placed on probation for three months.

A conduct report dated June 16, 1998 and signed by Teigen documents that Rocket had outstanding "trips" (trip sheets and bill of ladings that Marten needed in order to bill Anheuser-Busch for its services) that he had not submitted to payroll dating back to May 21, 1998. According to the report, Rocket told Teigen that he had submitted the reports on June 12, 1998. When she asked him why he waited to submit the reports, he responded that he would call her back but then never did. Rocket states that he cannot recall speaking to Teigen about these reports and that he was unable to call her as requested.

A conduct report dated June 22, 1998 and signed by Teigen states that Rocket refused to haul an extra load because he had to register his son for school. According to the report, Marten offered to call the school to make special arrangements and Rocket replied that they could do that but he still refused to cover the load. There is also a letter dated June 22, 1998, relating to this

incident, signed by Searing, that informs Rocket that Marten was placing him on a "final warning with a 6 month probationary period." The letter indicates that any violation of company policy during the probation could result in further disciplinary action up to and including termination. Rocket claims to have spoken with Teigen on June 22nd and that she responded to his question of whether he was going to be fired by stating, "I'm working on it." Teigen denies making this statement.

Finally, a conduct report dated July 24, 1998 and signed by Terry Grochowski documents the final events that led to Rocket's termination as a dedicated driver on that date. On July 15, 1998, Rocket was notified that he would have to deliver an extra load to Appleton, Wisconsin after he delivered his regular load on July 24, 1998. Rocket called Marten and explained that he could not do that load because he had plans. Rocket was told that he had to cover the load because it was classified as "dedicated for" Rocket, meaning that Anheuser-Busch had unilaterally scheduled it for him. On Wednesday, July 22, 1998, Rocket called Human Resources at Marten and notified them that the regular load and the extra load dispatched for July 24, 1998 was illegal, meaning that Rocket did not have enough hours to deliver both loads[5]. Marten, however, researched the two loads and concluded that they were legal dispatches. On Thursday, July 23, 1998, Searing spoke with Rocket about the July 24th Appleton load, and that after that discussion, Rocket was "good to go" on the Appleton load.

On July 24, 1998, Rocket sent a message to Marten that due to heavy traffic, he would be 45 minutes late for his regular load to Rockford that day. Marten deemed this as "no problem."

---

[5]Under the Department of Transportation Motor Carrier regulations, drivers cannot drive more than 10 consecutive hours in one day.

Rocket then called Grochowski and told him that he was not able to deliver the Appleton load because he would have used five hours on his Rockford load and it would take him seven hours for the Appleton load. Grochowski instructed Rocket to unload his truck and to report back with his estimated arrival time to Arlington Heights. After 30 minutes, Grochowski sent another message to Rocket inquiring about his estimated arrival time. Rocket responded that he did not know since he still had to get reloaded. Grochowski found out from the receiver in Rockford that Rocket left Rockford at 10:40 a.m., and Rocket sent a message that his estimated arrival time would be 1:00 - 2:00 p.m.. Grochowski then researched Rocket's progress on the Rockford load and discovered that Rocket had spent approximately one hour in Hillcrest, Illinois, which was out of route. Rocket had taken the load 55 miles out of route on a 143 mile load. Grochowski concluded that the reason Rocket was 45 minutes late was because he had taken the load 55 miles out of route.[6] Further, Grochowski learned from the safety department that Rocket had been calling them to tell them that he was being illegally dispatched rather than driving directly back to the shipper to cover the Appleton load.

Rocket called Grochowski again and Grochowski reminded him that he was on final warning and that refusing this legal dispatch would result in termination. Rocket still refused to take the Appleton load. Grochowski instructed Rocket to call him at 5:00 p.m.. Marten dispatched another driver to take the Appleton load, but since it was not loaded at Arlington Heights until 5:20, the receiver of that load instructed Marten to deliver it Saturday morning, July 25, 1998, at 8:00 a.m.. As a result of the day's events, Marten incurred two service failures, an irate delivery customer, and the involvement of corporate Anheuser-Busch.

---

[6]Rocket denies driving his truck 55 miles out of route.

Because of Rocket's history of performance problems, which culminated in the events on July 24, 1998, and because Anheuser-Busch had expressed dissatisfaction with Marten's drivers, Marten terminated Rocket from his position as a dedicated driver on the Anheuser-Busch route on July 24, 1998.[7] Rocket was not the only dedicated driver terminated from the Anheuser-Busch account because of performance problems. Specifically, Dan Webster, a white dedicated driver on that route, was also terminated for refusing to park his truck in Arlington Heights and for refusing to haul extra loads. Kit Gakhal, another white dedicated driver on the route, was also warned he could be terminated for refusing extra loads. Throughout its contract with Anheuser-Busch, Marten had difficulty providing satisfactory service to Anheuser-Busch at its Arlington Heights wholesale service center. In particular, Anheuser-Busch was concerned with timeliness. Anheuser-Busch expected Marten to address its concerns and to "fix the problem," but left the remedy up to Marten. Due to its service problems and the cost of services, Anheuser-Busch ultimately terminated its contract with Marten for the Arlington Heights service area well after the facts relevant in this case.

Upon his termination, Rocket filed a formal discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). On May 11, 1999, Rocket received his Notice of Right to Sue from the EEOC. Rocket commenced this litigation on June 15, 1999.

### III. Discussion

---

[7]Marten contends that it then offered Rocket a position as an over-the-road driver and gave him one week paid time off to consider that offer. When he did not respond, Marten considered Rocket to have terminated his employment relationship voluntarily. Rocket, however, does not recall this offer, although he does admit that he received the extra week of pay.

In setting forth an employment discrimination claim, a plaintiff may pursue two distinct evidentiary paths. Kormoczy v. Secretary, U.S. Dept. of HUD, 53 F.3d 821, 824 (7th Cir. 1995). On the one hand, he may choose to present direct evidence of discriminatory intent. Essex v. United Parcel Service, 111 F.3d 1304, 1308 (7th Cir. 1997). Alternatively, he may utilize an indirect method to raise an inference of an illegal motive, which involves a burden-shifting method established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817 (1973).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of proving a prima facie case of racial discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. Accordingly, he must demonstrate that (1) he is a member of a protected class; (2) he was performing his job well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action (discharge); and (4) his employer treated similarly situated employees outside his classification more favorably. Logan v. Kautex Textron North America, 259 F.3d 635, 639 (7th Cir. 2001); Oates v. Discovery Zone, 116 F.3d 1161, 1171-72 (7th Cir. 1997); Hughes v. Brown, 20 F.3d 745, 746-47 (7th Cir. 1994). Establishing this prima facie case creates a rebuttable presumption of discrimination. Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 722 (7th Cir. 1998).

The burden of production then shifts to the employer to articulate legitimate, non-discriminatory reasons for the challenged action. Id. The explanation must be legally sufficient to justify a judgement in the employer's favor. Kirk v. Fed. Prop. Mgmt. Corp., 22 F.3d 135, 138 (7th Cir. 1994) (citing Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 255, 101 S. Ct. 1089, 1094 (1981)). If the employer satisfies this burden, the presumption of discrimination

-11-

dissolves, and the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons proffered by his employer are actually pretext for discrimination. Id.; see also Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775 (1989).

The plaintiff may establish pretext by proving one of the following: "(1) [d]efendant's explanation had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the discharge." Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1133 (7th Cir. 1994); see also Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. In trying to establish that a defendant employer's explanation is pretextual, the plaintiff must "focus on the specific reasons advanced by the defendant." Smith v. Gen. Scanning Inc., 876 F.2d 1315, 1319 (7th Cir. 1989). The ultimate burden of proof remains with the plaintiff at all times. Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1032 (7th Cir. 1998).

*A. Title VII Claim*

Here, Rocket fails to establish his prima facie case. He has not demonstrated that he satisfactorily met Marten's expectations for continued employment as a dedicated driver. Likewise, Rocket has not furnished evidence that he was treated differently from similarly situated non-black drivers. Therefore, summary judgment is granted in favor of Marten and against Rocket.

Rocket bears the burden of showing that he satisfied Marten's legitimate expectations as a dedicated driver on the Anheuser-Busch route. Hughes v. Brown, 20 F.3d 745, 746 (7th Cir. 1994). Yet as the record indicates, Rocket clearly was having performance problems and was thus failing to meet Marten's expectations. During his employment, Rocket was placed on probation twice – the first time for three months and the second time for six months. When the

July 24th events occurred that directly precipitated Rocket's termination, he was on final warning and had been told that his failure to comply with any company policies could result in further disciplinary action up to and including termination.

In an attempt to counter his negative performance status, Rocket either denies or claims that he does not recall many of the instances for which he was written up, states that he had no knowledge of Marten placing conduct reports in his file, and he submits affidavits from Anheuser-Busch employees that state they cannot recall complaining about Rocket in particular. As Rocket himself points out, however, Anheuser-Busch's communications to Marten made no reference to drivers; any communications about a truck not being on time or a truck having some other problem was never written down or recorded or retained. In fact, employees at Anheuser-Busch cannot recall any drivers in particular who were late, but they do recall drivers showing up late. Rocket's denials and his failure to recall instances of misconduct do not create a genuine issue of material fact that would defeat a motion for summary judgment. See Weeks v. Samsung Heavy Indus., Co., 126 F.3d 926, 939 (7th Cir. 1997) (stating that a plaintiff's own uncorroborated testimony is insufficient to defeat a motion for summary judgment); Cowan, 123 F.3d at 196 (same); Edward E. Gillen Co. v. City of Lake Forest, 3 F.3d 192, 196 (7rth Cir. 1993) (stating that a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits).

Not only has Rocket failed to establish that he was performing his job well enough to meet Marten's legitimate expectations, he has also failed to show that similarly situated employees outside his protected classification were treated more favorably. See Brazinski v. Amoco Petroleum Additives, Co., 6 F.3d 1176, 1183 (7th Cir. 1993) (citing Celotex, 477 U.S.

-13-

317, 106 S. Ct. 2548) (stating that the moving party may "prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof"). Rocket's evidence is that of the five drivers on the Anheuser-Busch route, he was the only African American.[8] Further, Rocket baldly asserts that other white drivers who refused loads were not placed on final warning nor were they disciplined. Rocket, however, provides no evidentiary support for this statement. He improperly cites to his entire affidavit, and the affidavits of Kit Gakhal, Dan Webster, and Attorney Moenning. Yet Dan Webster was terminated for refusing to haul extra loads and for not parking his truck at Arlington Heights, and Kit Gakhal stated that he was warned he could be terminated for refusing extra loads. Therefore, Rocket does not meet this fourth factor for a prima facie case of racial discrimination.

Assuming arguendo that Rocket established a prima facie case of discrimination, he still could not survive summary judgment because the record does not demonstrate that the reasons cited for Rocket's discharge -- namely, that he had a history of performance problems in making late deliveries, he took a truck out of route without permission, and he refused loads -- are pretexts for discrimination. Rocket denies driving his truck out of route on July 24th and he asserts that the load he rejected that day was illegal. These actions, however, were not the sole reason for Rocket's termination; Marten stated that they were the "final straws." Further, the court's inquiry into pretext focuses not on the actual occurrence of the alleged acts, but "whether the employer honestly believes in the reason it offers." Kralman v. Illinois Dept. of Veteran's

---

[8] Rocket is inconsistent in making even this assertion. In his deposition, Rocket admits that Marten employed at least one other African American driver on the Anheuser-Busch route during Rocket's employment, although that driver "didn't stay real long." Additionally, Rocket's replacement was African American and he was hired before Rocket filed his discrimination charge with the EEOC.

Affairs, 23 F.3d 150, 156 (7th Cir. 1994) (citing McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992)); see also Timm v. Mead Corp., 32 F.3d 273, 275 (7th Cir. 1994). In other words, the issue of pretext "does not address the correctness or desirability of reasons offered for employment decisions." Id. Therefore, regardless whether Rocket in fact committed the misconduct on July 24th, the record shows that Marten honestly believed he did. Rocket cannot survive summary judgment.

*B. Section 1981 Claim*

Because Rocket cannot survive summary judgment on the Title VII claim, Rocket's section 1981 claim against Teigen and Marten also does not survive summary judgment. Section 1981 states that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefits of all laws and proceedings" regardless of race. 42 U.S.C. §§1981(a). The same standards for liability apply to both Title VII and §1981. Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998). Thus, since Rocket did not meet his burden for his Title VII claim, summary judgment is granted for defendants on the §1981 claim as well.[9]

## IV. Conclusion

For the foregoing reasons, this Court GRANTS defendants' motions for summary judgment on both counts, DENIES as moot defendants' motions to strike plaintiff's Local Rule 56.1 Response

---

[9] This Court strongly admonishes Rocket's counsel for distorting Teigen's deposition testimony in hopes of creating a genuine issue of material fact. Rocket's counsel's statement that "defendant Teigen while denying using racial slurs stated she and her friends used the "N" word" is blatantly false. The transcript of Teigen's deposition clearly shows that she admitted to hearing the "N" word "in a social atmosphere outside of work or maybe on television or . . . something like that," and she stated outright that she herself has never used the "N" word.

and to strike affidavit of Attorney Moenning, DENIES plaintiff's motion for partial summary judgment, DENIES as moot plaintiff's motion to strike defendants' Local Rule 56.1 Response, GRANTS motion for leave to modify plaintiff's Local Rule 56.1 response, and DENIES plaintiff's motion to strike affidavit of Susan Baier.

Enter:

_____
David H. Coar
United States District Judge

Dated: September 27, 2001